IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ERIC HAYNES,                          *

      Plaintiff,                 *

v.                                    *        Case No. TJS-19-1223

G & R TRUCKING, INC., *et al.,*        *

      Defendants.                *

                    *      *      *      *      *      *

**MEMORANDUM OPINION**

Pending before the Court is the Motion for Summary Judgment ("Motion") (ECF No. 39) filed by the Defendants G & R Trucking, Inc. ("G&R") and Guillermo Vargas ("Mr. Vargas") (collectively, the "Defendants").[1] Having considered the submissions of the parties (ECF Nos. 39, 40, & 41),[2] I find that a hearing is unnecessary. *See* Loc. R. 105.6. For the reasons set forth below, the Defendants' Motion will be granted in part and denied in part.

---

[1] On May 31, 2019, this case was assigned to me for all proceedings pursuant to 28 U.S.C. § 636(c) and Local Rule 301.4. ECF No. 17.

[2] Plaintiff's "Mtoion [sic] for Leave to File Surreply to Defendants' Rely [sic] to Plaintiff's Opposition to Defendants' Motion for Summary Judgment" (ECF No. 42) is denied. *See* Loc. R. 105.2(a) ("Unless otherwise ordered by the Court, surreply memoranda are not permitted to be filed."). A surreply may be permitted "when the moving party would be unable to contest matters presented to the court for the first time in the opposing party's reply." *Khoury v. Meserve*, 268 F. Supp. 2d 600, 605 (D. Md. 2003) (citation omitted), *aff'd*, 85 F. App'x. 960 (4th Cir. 2004). Plaintiff's proposed surreply does not respond to "matters presented to the court for the first time in the opposing party's reply," but rather includes information that Plaintiff could have, and did, address in his response. *Khoury*, 268 F. Supp. 2d at 605; *see, e.g.*, *Goodman v. Praxair Servs., Inc.*, 632 F. Supp. 2d 494, 512 n.8 (D. Md. 2009). Defendants' motion to strike Plaintiffs surreply (ECF No. 43) is denied as moot. With respect to the Defendants' motion to strike the affidavits and declarations filed in support of Mr. Haynes's opposition brief, the motion will also be denied as moot. *See* ECF No. 41 at 6-11. The Court has not relied on any of the statements contained in these declarations in ruling on the Motion.

I.      **Overview**

    A.      **Procedural History**

Plaintiff Eric Haynes ("Mr. Haynes") brought this employment discrimination case against the Defendants under 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964 ("Title VII"), codified, as amended, at 42 U.S.C. § 2000e *et seq.*, and the Maryland Fair Employment Practices Act ("MFEPA"), Md. Code, State Gov't § 20–101 *et seq.*[3] ECF No. 5.

Count One alleges that the Defendants discriminated against Mr. Haynes based on race, in violation of 42 U.S.C. § 1981. *Id.* ¶¶ 33-38. Count Two alleges that that the Defendants discriminated against him under a disparate treatment theory, in violation of Title VII. *Id.* ¶¶ 39-45. Count Three alleges that the Defendants retaliated against Mr. Haynes, in violation of Title VII. *Id.* ¶¶ 46-52. Count Four alleges that the Defendants created a hostile work environment for Mr. Haynes, in violation of Title VII. *Id.* ¶¶ 53-56. Counts Five, Six, and Seven mirror Counts One, Three, and Four, but are brought pursuant to the MFEPA. *Id.* ¶¶ 57-78. The Defendants have moved for summary judgment on all counts. ECF No. 39.

    B.      **Factual Background**

To resolve this Motion, the facts themselves, and the inferences to be drawn from the underlying facts, must be viewed in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). Mr. Haynes identifies as an African-American male. ECF No. 5 ¶ 3. In 2006, he began working for G&R as a truck driver. *Id.* ¶ 6. His main duty was to deliver construction materials (like sand, gravel, stone, and dirt) to "various sites." ECF No. 39-2 at 10.

---

[3] The MFEPA "is the state law analogue of Title VII." *Royster v. Gahler*, 154 F. Supp. 3d 206, 215 (D. Md. 2015). With limited exception, the same legal principles apply to Mr. Haynes's claims under § 1981, Title VII, and the MFEPA. *See Hawkins v. Leggett*, 955 F. Supp. 2d 474, 496-97 (D. Md. 2013) (noting that federal courts use Title VII standards to judge discrimination and retaliation claims brought under MFEPA).

G&R is owned by Mr. Vargas, a Hispanic male. ECF No. 5 ¶ 7. Approximately 12 years after Mr. Haynes began his employment with G&R, on January 26, 2018, he was terminated. *Id.* ¶ 31.

Mr. Haynes "learned early in his employment that there was a culture of open race-based discrimination at G&R." *Id.* ¶ 8. In 2010, Mr. Haynes "began to organize interested employees to help make the work environment better for all of Defendants' employees." *Id*. Mr. Haynes presented the employees' complaints to G&R in a document dated August 30, 2010 ("2010 Petition"). *Id.* ¶¶ 9-10; ECF No. 39-4. The 2010 Petition purported to be signed by a "majority of the drivers . . . at G&R." ECF No. 39-4 at 2. The drivers that signed the document made the following demands: the restoration of a monthly cell phone credit; an annual pay raise to account for cost of living increases; the implementation of a company sponsored health plan; the establishment of a policy requiring drivers to be paid for time spent waiting on their trucks to be repaired; the improvement of communication practices with drivers about changes in policy; the cessation of "nepotism and discrimination" in truck assignment, job assignment, and pay; and the implementation of a system of paid holidays, sick leave, and Christmas bonuses. *Id.* With regard to the complaints of "nepotism and discrimination," the 2010 Petition said nothing about what sort of conduct was at issue. It makes no mention of race.[4] According to Plaintiff's Amended Complaint, Mr. Vargas did not accede to the demands of Mr. Haynes and the other drivers, and

---

[4] In the Amended Complaint, Plaintiff states that the drivers he organized made complaints about Black drivers being paid less than Hispanic drivers, Black drivers not getting as many assignments as Hispanic drivers, and that Plaintiff, "despite having seniority, . . . was denied a new truck while Vargas gave Hispanic drivers who were new hires brand-new trucks." ECF No. 5 ¶ 9. Similarly, in his opposition brief and during his deposition, Plaintiff stated that the 2010 Petition was "race based." *See* ECF Nos. 40-1 at 2; 40-8 at 11, 14. The evidence in the record is not so clear on these issues. But the Court will assume for the sake of this Motion that in 2010, Mr. Haynes organized the other drivers to complain about race-based discrimination at G&R.

went so far as to expel Mr. Haynes from a company meeting and tell the other employees that he was a "troublemaker." ECF No. 5 ¶¶ 10-14.

Mr. Haynes alleges that, after the 2010 Petition, the Defendants continued to "[pit] the African-American drivers and Hispanic drivers against one another." *Id.* ¶¶ 15-16. Plaintiff alleges that the Defendants paid Hispanic drivers more than Black drivers, repaired the equipment used by Hispanic drivers faster than the equipment used by Black drivers, and gave Black drivers the "least desirable routes and assignments." *Id.* ¶ 16. Mr. Haynes made monthly requests "for the last six years of his employment" that the Defendants "correct discrepancies in his pay." *Id.* ¶ 19. Mr. Vargas refused his requests and berated him in front of other employees. *Id.* ¶¶ 19, 20 ("Vargas called Plaintiff a 'piece of shit' on 3-4 occasions when Plaintiff asked him to repair his truck.").

According to Plaintiff, Mr. Vargas "would often make racist and derogatory jokes" about G&R's Black drivers. *Id.* ¶ 20. On a weekly basis, he would remark that Black drivers didn't need health insurance because "Black guys get welfare," and that Black drivers were "lazy" and "piece(s) of junk."[5] *Id.* In making these remarks intended to insult Black employees, Mr. Vargas "encouraged other Hispanic employees to join him." *Id.*

In February 2017, Mr. Haynes filed a Charge of Discrimination against G&R with the Equal Employment Opportunities Commission ("EEOC"). ECF No. 40-10. In the Charge, he complained that Black drivers at G&R were paid "significantly less than the Hispanic Drivers," and that Black drivers were assigned to "less lucrative work" with older and less reliable

---

[5] The Defendants correctly note that some of these allegations are not supported by evidence in the record. ECF No. 41 at 4.

equipment. *Id.* He also complained that Mr. Vargas "makes racist remarks about the black drivers by saying we are Lazy, Horrible Drivers, and he should only hire Spanish guys."[6] *Id.*

Sometime in late 2016 Mr. Haynes temporarily stopped working for G&R. ECF No. 5 ¶¶ 23-24. It is unclear whether Mr. Haynes was laid off or fired, or if he voluntarily stopped working because his truck was out of repair. In any event, Mr. Haynes returned to work with G&R in February 2017, after he had filed the Charge with the EEOC. A few days before Mr. Haynes returned to work, Mr. Vargas confronted Mr. Haynes about the Charge and "urged him to withdraw it." *Id.* ¶ 27. Mr. Haynes refused to withdraw the Charge. *Id.*

In early 2018, Mr. Haynes "started a petition and wanted to collectively bargain with Defendants." *Id.* ¶ 29. This petition ("2018 Petition") is dated January 26, 2018, and addressed to "G&R / Vargas & Son's Trucking" from the "Drivers of G&R / Vargas & Son's." ECF No. 39-4 at 4. The 2018 Petition requests that drivers be paid for the hours that they work during a snowstorm in a manner that is "apart from the $600.00 Weekly Minimum Salary [the drivers' have during winter season (January to March)." *Id.* The 2018 Petition states that the signers were "open for a meeting with Mr. Vargas" but that if he rejected or ignored the petition, the signers would "only work normal working hours Monday to Saturday . . . and will not be working during a Snow Storm." *Id.* The 2018 Petition did not mention race or complain of discrimination on the basis of

---

[6] On November 29, 2018, ten months after G&R terminated Mr. Haynes's employment, the EEOC issued a Determination on Mr. Haynes's Charge. ECF No. 5-1. The Determination stated that the EEOC's investigation "revealed that Mr. Vargas 'made racial comments to employees which included references to 'your kind,' comments that Black drivers were pieces of trash and junk drivers, and stated that when Black and White males are seen together, drugs are involved." *Id.* at 1. The EEOC found that "such comments by Mr. Vargas were pervasive in the workplace." *Id.* Based on this, the EEOC determined that Mr. Haynes "was subjected to harassment that created a hostile work environment due to his race by." *Id.* The EEOC made no findings regarding Mr. Haynes's other allegation regarding the unequal terms and conditions of his employment and G&R's retaliation against him. *Id.*

race. Instead, the petition was about "snow pay." ECF Nos. 40-8 at 14; 41-1 at 7. According to Plaintiff, "Vargas learned of the petition and circulated word among the drivers that whoever delivered it to management would be immediately fired."[7] ECF No. 5 ¶ 30.

On January 26, 2018 (the same day that the 2018 Petition is dated), Mr. Haynes went to the Defendants' finance office to "discuss a discrepancy in his pay." *Id.* ¶ 31. Mr. Haynes met with Mr. Vargas. Mr. Vargas said that Mr. Haynes had not been paid for the shift in question because he had been reported as a "no-call, no-show." *Id.* Mr. Haynes insisted that Mr. Vargas speak with the foreman that reported his absence but Mr. Vargas declined to do so. *Id.* Mr. Vargas terminated Mr. Haynes at the conclusion of the meeting.

After his termination, Mr. Haynes was interviewed by the State of Maryland's Department of Labor, Licensing, and Regulation, Division of Unemployment Insurance. ECF No. 39-5. According to the "Agency Fact-Finding Report" generated from this interview, Mr. Haynes discussed the circumstances that precipitated his termination. Mr. Haynes reported that he was terminated because of a "negative interaction" with Mr. Vargas. *Id.* at 1. On January 26, 2018, he reported to Mr. Vargas to discuss the paycheck that he had just received for less than the "full amount." *Id.* Mr. Haynes "got really upset and called [Mr. Vargas] a piece of shit boss" in front of customers and other employees. *Id.* Mr. Haynes reported that he was "very agitated with [Mr.

---

[7] Plaintiff alleges that a few weeks before he was terminated, an employee named DeAndre Boxley delivered the 2018 Petition to Mr. Vargas and was immediately fired. ECF Nos. 5 ¶ 31; 40-1 at 4. There is no evidentiary support for this allegation in the record. In addition, during Mr. Haynes's deposition, he stated that the 2018 Petition had not been delivered to G&R at the time that he was terminated. ECF No. 40-9 at 20-21. This is consistent with a handwritten note included with Plaintiff's opposition that indicates Mr. Boxley was fired on February 3, 2018, after Mr. Haynes had been fired. Finally, Plaintiff states that "[t]he record shows that Vargas fired Haynes after he learned that Plaintiff was organizing the drivers to advocate for snow pay. Ex. 6 at ¶31." ECF No. 40-1 at 4. In support of this claim, Plaintiff cites an allegation in his Amended Complaint, which is not actually evidence in the record. In any event, the timing of the delivery of the 2018 Petition to the Defendants is immaterial to the Court's decision on the Motion.

Vargas] because he did not seem to want to talk . . . about the issue." *Id.* Mr. Haynes raised his voice, insulted Mr. Vargas, and "walked aggressively" in his direction. *Id.* He "got in [Mr. Vargas's] face and yelled at him." Mr. Vargas told Mr. Haynes "to go talk to Frank," his foreman, but Mr. Haynes "kept yelling." *Id.* Mr. Haynes stated that he "should not have raised [his] voice, insulted [Mr. Vargas] by call[ing] him [a] piece of shit boss or acted aggressively." *Id.* During his deposition, Mr. Haynes generally corroborated the statement he made to the Division of Unemployment Insurance.[8] ECF No. 40-9.

Mr. Vargas was also interviewed by the Division of Unemployment Insurance. ECF No. 39-5 at 2. He stated that he terminated Mr. Haynes "because he acted aggressively to me" and G&R has "zero tolerance for aggressive behavior." *Id.* Mr. Vargas explained that Mr. Haynes did not get paid for the week ending January 27, 2018 "because he was not coming in on time in the morning," which is required to receive the full pay. *Id.* Mr. Vargas stated that he and the foreman confronted Mr. Haynes about the issue and Mr. Haynes "got really upset." *Id.* Mr. Haynes "raised his voice and came at [Mr. Vargas] aggressively" in front of customers and other employees. *Id.* Thereafter, Mr. Vargas fired Mr. Haynes. *Id.*

On January 31, 2019, the EEOC issued a Notice of Right to Sue letter to Mr. Haynes. ECF No. 40-9 at 22-24. Mr. Haynes filed his initial Complaint in this Court on April 25, 2019, and later filed an Amended Complaint. *See* ECF Nos. 1, 5, and 8.

---

[8] Although he generally corroborated his prior statement, Mr. Haynes described this interaction differently during his deposition. He testified that when he approached Mr. Vargas about the pay discrepancy, Mr. Vargas told him to "get out of here" and called him a "piece of junk driver." ECF No. 40-8 at 20. In response, Mr. Haynes asked if he was fired and Mr. Vargas said "yeah, you're fired." *Id.* Mr. Haynes testified that he did not curse at Mr. Vargas, but he did call him a "piece of junk boss." *Id.* at 21. There is other evidence that indicates Mr. Haynes did not threaten or act aggressively toward Mr. Vargas. *See* ECF No. 40-16. For reasons discussed later in this opinion, the circumstances immediately preceding Mr. Haynes's termination are immaterial to the Court's ruling on the Motion.

II.     **ANALYSIS**

A.      **Standard of Review**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden is on the moving party to demonstrate the absence of any genuine dispute of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). If sufficient evidence exists for a reasonable jury to render a verdict in favor of the party opposing the motion, then a genuine dispute of material fact is presented and summary judgment should be denied. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). However, the "mere existence of a scintilla of evidence in support of the [opposing party's] position" is insufficient to defeat a motion for summary judgment. *Id.* at 252.

The facts themselves, and the inferences to be drawn from the underlying facts, must be viewed in the light most favorable to the opposing party. *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008). A party may not rest upon the mere allegations or denials of its pleading but instead must cite to "particular parts of materials in the record" or "show[] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). Supporting and opposing affidavits are to be made on personal knowledge, contain such facts as would be admissible in evidence, and show affirmatively the competence of the affiant to testify to the matters stated in the affidavit. Fed. R. Civ. P. 56(c)(4).

B.      **Race Discrimination (Counts One, Two, and Five)**

In Count One, Plaintiff alleges that the Defendants are liable for discrimination based on race, in violation of 42 U.S.C. § 1981. ECF No. 5 ¶¶ 33-38. In Count Two, Plaintiff alleges that

the Defendants engaged in disparate treatment based on race, in violation of Title VII. *Id.* ¶¶ 39-45. Similarly, in Count Five, Plaintiff alleges that Defendants are liable for race discrimination under the MFEPA. *Id.* ¶¶ 57-64. For each of these claims, Plaintiff essentially advances a disparate treatment theory.

Section 1981 provides: "All persons within the jurisdiction of the United States shall have the same right in every State and Territory . . . to the full and equal benefit of all laws . . . as is enjoyed by white citizens[.]" 42 U.S.C. § 1981(a). "Although Section 1981 does not explicitly use the word 'race,' the Supreme Court has construed the statute to ban all racial discrimination in the making of public and private contracts." *Nnadozie v. Genesis Healthcare Corp.*, 730 F. App'x 151, 156 (4th Cir. 2018) (citing *Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 609 (1987)); *see Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454, 459-60 (1975) ("§ 1981 affords a federal remedy against discrimination . . . on the basis of race."). "Thus, § 1981 bar[s] racial discrimination in the workplace." *Scott v. Lori*, No. ELH-19-2014, 2020 WL 3833129, at *21 (D. Md. July 8, 2020) (citing *See Yashenko v. Harrah's N.C. Casino Co., LLC*, 446 F.3d 541, 551-52 (4th Cir. 2006)).

To establish a § 1981 claim, a plaintiff must show that he is a member of a racial minority; that the defendants' adverse employment action was because of his race; and that the defendants' discrimination was intentional. *Jordan v. Alternative Res. Corp.*, 458 F.3d 332, 345 (4th Cir. 2006), overruled on other grounds by *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264 (4th Cir. 2015)); *see also Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, --- U.S. ----, 140 S. Ct. 1009, 1019 (2020) (holding that to prevail on a § 1981 claim, a plaintiff must "prove that, but for race, it would not have suffered the loss of a legally protected right"); *Gary v. Facebook, Inc.*, No. 18-1994, 2020 WL 5036218, at *4 (4th Cir. Aug. 26, 2020) (noting that applying the

*McDonnell Douglas* framework to a § 1981 claim "is consistent with the Supreme Court's recent decision" in *Comcast Corp.*, 140 S. Ct. 1009).

Under Title VII and the MFEPA, "[d]isparate treatment occurs when an employer treats certain people less favorably than others on the basis of a protected classification such as race." *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 207 (4th Cir. 2019) (quoting *Carter v. Ball*, 33 F.3d 450, 456 n.7 (4th Cir. 1994)). "To establish a prima facie case of disparate treatment, [a plaintiff] must show: (1) membership in a protected class; (2) satisfactory work performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class." *Perkins*, 936 F.3d at 207 (quoting *Coleman v. Md. Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010)).

Under § 1981, Title VII, and the MFEPA, a plaintiff may prevail on a claim of employment discrimination by two avenues of proof. *Scott*, 2020 WL 3833129, at *22 (citing *Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 223 (4th Cir. 2019)). First, a plaintiff may offer "direct or indirect" evidence of discrimination under "ordinary principles of proof." *Id.* (quoting *Burns v. AAF-McQuay, Inc.*, 96 F.3d 728, 731 (4th Cir. 1996)). Second, a plaintiff may follow the *McDonnell Douglas* burden-shifting approach. *Id.; see also Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985) ("[T]he McDonnell Douglas test is inapplicable where the plaintiff presents direct evidence of discrimination.").

> The McDonnell Douglas framework is comprised of three steps: (1) the plaintiff must first establish a prima facie case of employment discrimination or retaliation; (2) the burden of production then shifts to the employer to articulate a non-discriminatory or non-retaliatory reason for the adverse action; (3) the burden then shifts back to the plaintiff to prove by a preponderance of the evidence that the stated reason for the adverse employment action is a pretext and that the true reason is discriminatory or retaliatory.

*Guessous v. Fairview Prop. Investments, LLC*, 828 F.3d 208, 216 (4th Cir. 2016) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-56 (1981)).

In a case of discrimination based on disparate treatment, an "employer simply treats some people less favorably than others because of their race, color, religion, sex, or national origin." *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977). To establish a prima facia case of disparate treatment, a plaintiff must demonstrate that (1) he is a member of a protected class; (2) he suffered an adverse employment action; (3) his job performance was satisfactory at the time of the adverse employment action; and (4) he was treated differently from similarly situated employees outside his protected class. *Goode v. Cent. Va. Legal Aid Soc'y, Inc.*, 807 F.3d 619, 626 (4th Cir. 2015); *White v. BFI Waste Servs., LLC*, 375 F.3d 288, 295 (4th Cir. 2004).

Here, it appears that Mr. Haynes intends to proceed by the *McDonnell Douglas* burden-shifting approach.[9] Under that approach, the Court must first consider whether Plaintiff has established a prima facie case of employment discrimination.

The Defendants do not dispute that Mr. Haynes is a member of a protected class. *See* ECF No. 39-1 at 7. The Defendants concede that Mr. Haynes suffered one adverse employment action (termination), but they argue that his other complaints about the disparity of the assignment of trucks, the assignment of job duties, and the rates of pay do not amount to adverse employment actions. Mr. Haynes alleges a number of different types of adverse employment actions.[10] In Count One, Mr. Haynes alleges that the Defendants discriminated against him by:

> not compensating Black drivers the same as Hispanic drivers; not compensating Black drivers for all of their time at work; not giving Black drivers as many assignments; refusing to make repairs on Black drivers' trucks and denying their

---

[9] Plaintiff's arguments on the discrimination claims are muddled, making it somewhat unclear which approach he employed in opposing the Defendant's Motion.

[10] Notably, Mr. Haynes does not allege in these counts that he was terminated because of his race.

11

requests for upgraded vehicles, Defendants intentionally deprived the Plaintiff the same rights as are enjoyed by Hispanic employees to the creation, performance, enjoyment, and all benefits and privileges of their employment relationship with G&R, in violation of 42 U.S.C. § 1981.

ECF No. 5 ¶ 35.

In Counts Two and Five, Mr. Haynes alleges that the Defendants intentionally discriminated against him by: making racist jokes and comments about him and other Black employees, providing lower quality vehicles to Black drivers compared to the vehicles provided to Hispanic drivers, paying him less and giving him less desirable work assignments, disabling his work vehicle and taking longer to repair it than it did to repair the vehicles of Hispanic employees. *Id.* ¶¶ 41-43, 60-62.

An adverse employment action is a discriminatory act that adversely affects the "terms, conditions, or benefits" of employment. *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir. 2004). Adverse employment actions include "discharge, demotion, decrease in pay or benefits, loss of job title or supervisory responsibility, or reduced opportunities for promotion." *Boone v. Goldin*, 178 F.3d 253, 255 (4th Cir. 1999).

I find that Mr. Haynes's complaints about disparate pay, disparate job assignments, and disparate truck assignments are acts by the Defendants that adversely affect the "terms, conditions, or benefits" of employment. To the extent that the Defendants have argued that there is no evidence of the claimed disparities, I find that there is a genuine dispute of material fact on this point. Mr. Haynes has submitted some evidence that Black drivers were paid less than Hispanic drivers, and that he (as a Black driver) was paid less than he should have been paid on account of his race. This evidence is far from conclusive—in the Court's view it is very weak—but it is enough evidence

to allow a jury to decide the question.[11] The same goes for the claimed disparities in truck assignment and route assignment.[12] I further find that these adverse employment actions occurred without regard to whether Plaintiff's job performance was satisfactory (the Defendants do not argue to the contrary). I also find that there is sufficient evidence to allow a jury to conclude that Plaintiff was treated differently from other similarly situated drivers outside his protected class. Accordingly, Plaintiff has established a prima facie case of discrimination under § 1981, Title VII, and the MFEPA.

The Defendants have not offered any non-discriminatory reason for these adverse actions. They dispute that the actions are adverse at all. As such, the Court is not required to consider whether Plaintiff has submitted sufficient evidence to show that the Defendants' explanation is a pretext for discrimination. A reasonable jury could conclude that the Defendants discriminated

---

[11] The Court conducted its own statistical analysis using the data in the record regarding the assignment of trucks (by year and model) to Black drivers and Hispanic drivers, and the rates of compensation for Black drivers and Hispanic drivers. *See* ECF No. 39-6. The median year of the truck assigned to Black drivers was 2005, two years older than the 2007 median year of truck for Hispanic drivers (there is a slightly greater disparity in favor of Hispanic drivers when considering the average year of truck assigned). The median model assigned to Black drivers was Mack, which the drivers viewed as less reliable. (There was something to the drivers' saying that "Blacks get Macks.") ECF No. 40 at 7. Only about 10% of Hispanic drivers were assigned Mack trucks; nearly two-thirds of Hispanic drivers were assigned the preferred Peterbilt brand truck. The Court's analysis of the median and average pay to Black drivers compared to Hispanic drivers is somewhat inconclusive. On average, Hispanic drivers were paid slightly more, but the difference is very slight. The median pay for Hispanic drivers was one percentage point higher than the median pay for Black drivers. Mr. Haynes was paid more than the average pay for Hispanic drivers and equal to their median pay, but he was not paid as much as the 10% highest paid Hispanic drivers. There may be a legitimate, non-discriminatory reason for this, but the Court will leave that for a jury to decide. The Defendants have not presented sufficient evidence to show that they are entitled to judgment as a matter of law on this issue.

[12] Before this case proceeds to trial, the Court intends to hold a pretrial conference with the parties to determine the types of evidence that Plaintiff will be permitted to rely on to prove his claims and which theories of discrimination he will be permitted to advance at trial. The Court will not permit any evidence to go before the jury that will only cause confusion and waste time.

against Mr. Haynes on the basis of his race. Accordingly, I will deny the Defendants' Motion as to Counts One, Two, and Five.

## C.    Hostile Work Environment (Counts Four and Seven)

In Counts Four and Seven of the Amended Complaint, Mr. Haynes asserts hostile work environment claims against the Defendants pursuant to Title VII and the MFEPA. "An employer contravenes [42 U.S.C.] § 2000e–2(a)(1) by, inter alia, requiring an African-American employee to work in a racially hostile environment." *Boyer-Liberto*, 786 F.3d at 277. A hostile work environment exists "when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment." *Id.*

To prove a hostile work environment claim based on race, a plaintiff must show that (1) the plaintiff experienced unwelcome harassment; (2) the harassment was based on the plaintiff's race; (3) the harassment was sufficiently severe or pervasive to alter the conditions of employment and to create an abusive atmosphere; and (4) there is some basis for imposing liability on the employer. *Baquir v. Principi*, 434 F.3d 733, 745-46 (4th Cir. 2006). To determine whether harassment is sufficiently severe or pervasive, courts consider the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Boyer-Liberto*, 786 F.3d at 277 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)).

The Defendants do not contest that Mr. Haynes may have experienced unwelcome harassment from Mr. Vargas that was based on his race. *See* ECF No. 39-1 at 12-13. Instead, they argue that the conduct was not sufficiently severe or pervasive. *Id.* The Defendants argue that while

14

Mr. Vargas may have told racist jokes on a weekly basis, the jokes did not use racial epithets. *Id.* In addition, the Defendants note that there is no evidence that the racist jokes actually interfered with Mr. Haynes's work. *Id.* at 13 ("The conduct complained of did not interfere with Plaintiff's work. Indeed, Plaintiff performed at a high level and was [one] of Defendants' best drivers."). As such, the Defendants argue, Mr. Haynes cannot meet the third element of his hostile work environment claims.

Two important factors in this case could lead a reasonable jury to conclude that the Defendants subjected Mr. Haynes to a racially hostile work environment. First, there is some evidence that Mr. Vargas made demeaning comments and racist jokes on a regular basis. The evidence is limited, but a jury might find that Plaintiff's repeated exposure to demeaning comments and racist jokes transformed his workplace into a hostile environment. *See Boyer-Liberto*, 786 F.3d at 277 ("[V]iable hostile work environment claims often involve repeated conduct."). Second, the person alleged to have made the racial jokes and demeaning comments was Mr. Vargas, the owner and operator of Plaintiff's employer. A jury might conclude that the racist jokes and comments made by Mr. Vargas were especially injurious to Plaintiff because they were made by the owner of the company. *Id.* at 278 ("[A] supervisor's power and authority invests his or her harassing conduct with a particular threatening character.") (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 763 (1998)); *see also Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 184 (4th Cir. 2001) (holding that a reasonable jury could find that an African-American plaintiff was subject to a hostile work environment where he was continuously exposed to racist comments by his supervisor).[13] Accordingly, the Defendants' Motion will be denied as to these counts.

_____

[13] The Court rejects Plaintiff's other theories for his hostile work environment claims because disparities in pay, equipment assignment, working hours, and the like are not acts of "harassment" under Title VII or the MFEPA, at least under the circumstances here. The same goes

D.      **Retaliation (Counts Three and Six)**

In Counts Three and Six of the Amended Complaint, Mr. Haynes asserts claims for retaliation against the Defendants pursuant to Title VII and the MFEPA. "Title VII forbids . . . retaliation against an employee for opposing adverse actions that she reasonably suspects to be unlawful under Title VII." *Strothers v. City of Laurel, Maryland*, 895 F.3d 317, 327 (4th Cir. 2018). A plaintiff may prove that an employer took action with retaliatory intent through direct evidence or through the burden-shifting framework of *McDonnell Douglas*. *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 249 (4th Cir. 2015).

Under the burden-shifting framework, the plaintiff must first make out a prima facie case of retaliation by showing "(1) she engaged in a protected activity; (2) the employer acted adversely against her; and (3) there was a causal connection between the protected activity and the asserted adverse action." *Strothers*, 895 F.3d at 327. Once this showing is made, "[t]he burden then shifts to the [employer] to show that its purportedly retaliatory action was in fact the result of a legitimate non-retaliatory reason." *Id.* (quoting *Foster*, 787 F.3d at 250). "If the employer makes this showing, the burden shifts back to the plaintiff to rebut the employer's evidence by demonstrating that the employer's purported nonretaliatory reasons were not its true reasons, but were a pretext for discrimination." *Id.*

"Employment practices made unlawful by Title VII are those that discriminate against employees on the basis of race, color, religion, sex, or national origin." *Lim v. Azar*, 310 F. Supp. 3d 588, 603 (D. Md. 2018) (citing 42 U.S.C. § 2000e–2 (delineating unlawful employment practices under Title VII)). To qualify as protected activity, the employment practices opposed

---

for Plaintiff's allegation that Mr. Vargas forced him to leave a meeting in anger on one occasion. At trial, Plaintiff will be limited to proving his hostile work environment claims based on the demeaning remarks that Mr. Vargas made.

may be either actually unlawful under Title VI" or reasonably believed by the employee to be unlawful. *Boyer-Liberto*, 786 F.3d at 282. To qualify as protected activity, an employee's complaints must communicate "a belief that the employer has engaged in . . . a form of employment discrimination" based on a protected class. *Crawford v. Metrop. Gov't of Nashville and Davidson Cty.*, 555 U.S. 271, 276 (2009). An employee's complaints about management activities that would not constitute unlawful discrimination do not qualify as protected activity. *See Freilich v. Upper Chesapeake Health, Inc.*, 313 F.3d 205, 216-17 (4th Cir. 2002) (finding no Americans with Disabilities Act retaliation claim because the plaintiff could not reasonably believe that the conduct she had opposed violated the ADA, even though the opposed conduct could have violated state medical malpractice law); *see also Bowman v. Balt. City Bd. of Sch. Commr's*, 173 F. Supp. 3d 242, 248 (D. Md. 2016) ("General complaints of unfair treatment are not protected activity.").

Plaintiff argues that he engaged in protected activity on January 26, 2018 "when he went to Vargas to complain about Defendant's continued discriminatory practice of shorting his pay."[14] There is no evidence that Mr. Haynes's pay for the week ending January 27, 2018 was shorted because of discrimination. At most, the evidence shows that his pay was shorted because he was alleged to have been late for work. ECF No. 39-5 at 2. Whether or not G&R was correct to short Plaintiff's pay on this occasion, there is no suggestion or evidence that it did so because of discrimination. And there is no evidence that Plaintiff believed he had been discriminated against

---

[14] Plaintiff does not argue that the 2010 Petition or the EEOC Charge that he filed in February 2017 constitute protected activity for purposes of his retaliation claims. *See* ECF No. 40 at 9, 11. Even if he had made these arguments, the Court would have concluded that these activities were not causally connected to his termination as they were too remote in time and no other evidence of causal connection has been presented. *See Perry v. Kappos*, 489 F. App'x 637, 643 (4th Cir. 2012) ("Although neither we nor the Supreme Court have adopted a bright temporal line, we have held that a three- or four-month lapse between the protected activities and discharge was too long to establish a causal connection by temporal proximity alone.") (internal quotation marks and citation omitted).

on January 26, 2018 when his pay was shorted. Title VII does not make it unlawful for an employer to incorrectly calculate an employee's pay where the miscalculation is not the result of unlawful discrimination.

Complaining about receiving an inaccurate paycheck—in the absence of any evidence that the underpayment is because of discrimination—is not a protected activity under Title VII. In support of his argument to the contrary, Plaintiff cites *Sankoh v. Gold St. Capital Fund*, No. PX-17-2276, 2018 WL 1709115, at *3 (D. Md. Apr. 9, 2018). Plaintiff claims that *Sankoh* stands for the proposition that "[i]f a termination is the result of an employee's complaint about an unlawful reduction in his or her pay—that is an adverse action as a matter of law." ECF No. 40 at 9. Plaintiff ignores an important point. *Sankoh* was a wage and hour case brought pursuant to the Maryland Wage Payment and Collection Law and the Fair Labor Standards Act ("FLSA"). The FLSA has its own retaliation provision, which forbids employers from taking adverse action against employees who have engaged in protected activity under the FLSA. 29 U.S.C. § 215(a)(3). Of course, an employee's complaint about unpaid wages is protected activity under the FLSA. But complaining about mistakenly unpaid wages is not—by itself—protected activity under Title VII. Here, Plaintiff's retaliation claims are brought pursuant to Title VII and the MFEPA, not the FLSA. Mr. Haynes's activities in connection with his complaints about being shorted on his pay for the week ending January 27, 2018 are not protected activities under Title VII.

The same goes for Mr. Haynes's activities connected to the 2018 Petition. There is no evidence that the 2018 Petition was created in opposition to any practice that is unlawful under Title VII. The 2018 Petition concerned snow pay for all drivers, Black and Hispanic alike. Mr. Haynes's arguments in his opposition brief, in which he characterizes the 2018 Petition as challenging "Vargas' continued wage discrimination," *see* ECF No. 40 at 11, are unsupported by

any evidence in the record. And these arguments are inconsistent with Mr. Haynes's own deposition testimony where he explained that, while the 2010 Petition made demands based on race, the 2018 Petition did not. ECF No. 40-8 at 11, 14 ("The second petition in 2018 was for the snow pay."). The Court has reviewed every page of evidence in the record. There is not even a hint that the 2018 Petition was a challenge to any practice by the Defendants that was discriminatory on the basis of race or that Mr. Haynes reasonably believed was discriminatory.

Because Plaintiff did not engage in protected activity under Title VII, he cannot make out a prima facie case under the *McDonnell Douglas* burden-shifting framework. Because he has not made out a prima facie case, it is immaterial under Title VII whether the Defendants terminated him for acting aggressively or to get back at him for complaining about being shorted on his pay. Accordingly, the Defendants' Motion will be granted as to the retaliation counts.

**III.    Conclusion**

At this stage of the proceedings and given the record evidence provided by the parties, Mr. Haynes has generated sufficient evidence that would allow a reasonable jury to conclude that the Defendants discriminated against him on the basis of his race and subjected him to a hostile work environment. Mr. Haynes has not done the same with his claims of retaliation. Therefore, the Defendant's Motion for Summary judgment will be denied as to Counts One, Two, Four, Five, and Seven. The Motion will be granted as to Counts Three and Six.

Mr. Haynes has presented limited evidence to support his claims for discrimination and hostile work environment, but it is sufficient to allow the case to proceed to trial on these claims. It would be inappropriate for the Court to evaluate the credibility of Mr. Haynes and Mr. Vargas. That is a job for the jury. As other courts have noted, "proof of discrimination is often elusive." *Lapsley v. Columbia Univ.-College of Physicians and Surgeons*, 999 F. Supp. 506, 515-16

(S.D.N.Y. 1998). When an employer's intent is at issue, "direct, smoking gun, evidence of discrimination" is seldom available. *Id.*; *see also* D. Brock Hornby, *Summary Judgment Without Illusions,* 13 Green Bag 2d 273 (Spring 2010) (opining that "[j]udges should be slow to take inference questions away from juries," particularly in employment discrimination cases "where the critical issue – inference of discriminatory intent – is so fact-intensive"); *Lapsley*, 999 F. Supp. at 516 (noting that "[c]ourts must continue to be mindful that clever men may easily conceal their motivations.").

An implementing Order will accompany this Memorandum Opinion.

Given the ongoing COVID-19 pandemic, the Court intends to wait until its schedule is more predictable before scheduling the trial date in this case. When that times comes, my chambers will contact counsel to schedule a conference call to set a trial date and deadlines for pretrial submissions. If the parties believe that referral to another magistrate judge for a settlement conference would be helpful, they should advise my chambers.


September 28, 2020                                    _____/s/_____
Date                                                 Timothy J. Sullivan
                                                     United States Magistrate Judge